Filed 5/29/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| AFSHAN MULTANI, et al., | B237295M |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. GC044440) |
| v. | |
| WITKIN & NEAL et al., | ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT) |
| Defendants and Respondents. | |


THE COURT:

IT IS ORDRED that the opinion filed herein on May 1, 2013, be modified as follows:

1. On page 12, footnote 6 (footnote 6 begins on page 11 and continues onto page 12) delete the last sentence, which states:

"Plaintiffs also pleaded a claim for cancellation of deed against ProValue, which is not a party to this appeal."

The last sentence shall be replaced with the following language:

"Plaintiffs also pleaded a claim for cancellation of deed against ProValue, which the trial court dismissed in an order granting ProValue's motion for judgment on the pleadings. Although plaintiffs' notice of appeal references this order, their briefs contain no legal analysis of ProValue's claims or the court's order granting ProValue judgment on those claims. Plaintiffs have therefore abandoned any claim of

error regarding the trial court's order granting ProValue's motion for judgment on the pleadings.  (*Tan v. California Fed. Sav. & Loan Assn*. (1983) 140 Cal.App.3d 800, 811 [issues not raised in an appellate brief are deemed waived or abandoned].)

2.  On page 32, the following sentence shall be added to the end of footnote 16 (footnote 16 begins on page 31 and continues onto page 32):

"On remand, the trial court shall consider the effect of our reversal of the judgment on its award of attorney's fees."

3.  On page 32, in the last sentence of the disposition, the word "bear" shall be added between the words "shall" and "its", so that the modified sentence reads: "Each party shall bear its own costs."

The foregoing does not affect a change in the judgment.  Appellants' petition for rehearing is denied.

_____
PERLUSS, P. J.                    ZELON, J.                    JACKSON, J.

2

Filed 5/1/13 (unmodified version)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| AFSHAN MULTANI et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>WITKIN & NEAL et al.,<br><br>    Defendants and Respondents. | B237295<br><br>(Los Angeles County<br>Super. Ct. No. GC044440) |

     APPEAL from a judgment of the Superior Court of Los Angeles County, C. Edward Simpson, Judge.  Reversed.

     Law office of Gary Kurtz and Gary Kurtz for Plaintiffs and Appellants.

     Richardson Harman Ober, Kelly G. Richardson and Brian D. Moreno for Defendants and Respondents.

————————————————

# INTRODUCTION

The Castle Green Homeowners Association notified Afshan and Rahim Multani that they were delinquent in paying their monthly assessment fees. After the Multanis disputed the debt, the Association conducted a nonjudicial foreclosure sale of their condominium unit. The Multanis sued to set aside the foreclosure alleging irregularities in the sale notices and procedure. They further alleged that the Association and its agents had committed tortious acts during the foreclosure process.

The defendants filed a motion for summary judgment or adjudication arguing that the court should dismiss the foreclosure claims because plaintiffs had actual knowledge of the foreclosure proceedings and failed to exercise their post-sale right of redemption. The defendants also argued that plaintiffs' tort claims were untimely and predicated on privileged conduct related to the foreclosure process. The court granted the motion.

We reverse the trial court's dismissal of plaintiffs' claims seeking to set aside the foreclosure sale, concluding that defendants failed to demonstrate that they notified the plaintiffs of their right of redemption as required by Code of Civil Procedure section 729.050.

# FACTUAL AND PROCEDURAL BACKGROUND

## A. *Summary of Plaintiffs' Complaint*

### 1. *Plaintiffs' factual allegations*

In January of 2010, plaintiffs Afshan and Rahim Multani filed a complaint against the Castle Green Homeowners Association (the Association) and numerous other parties arising from a foreclosure of the Multanis' condominium unit.[1] The complaint alleged that, in 1998, plaintiffs had purchased a condominium unit in the "Castle Greens" building in Pasadena, California. Plaintiffs obtained financing to purchase the unit from Chase Bank, who later transferred the loan to Indymac Bank.

---

[1] This factual summary is predicated on the allegations in plaintiffs' second amended complaint, which was filed on June 28, 2010.

In 2005, Rahim Multani returned from an overseas trip and was informed by the Association and its agents, LB Property Management and SBS Lien Services, that he was delinquent in paying his homeowner assessment fees. Although Multani paid the delinquent fees, he received a letter from SBS in August of 2005 alleging that he still owed approximately $2,000 in fees and costs. Multani met with SBS and issued a payment of $743.16 that was never credited to his account. In October, Multani attempted to pay the Association his monthly assessment but was told that the account had been referred to SBS "for collection." One month later, the Association, acting through SBS, recorded a notice of delinquent assessment against the property in the amount of $3,317, which consisted of $2,229 in unpaid assessments and an additional $1,087 in attorney's fees, costs, late fees and interest.

Throughout 2006, Multani and the Association continued to "disput[e] the validity of the amount . . . owed . . ." In February of 2007, Multani received a notice of sale informing him that the Association "intended to enforce the lien created by the November . . . recording of the Notice of Assessment by selling the Subject Property on March 27, 2007." The Association alleged that Multani now owed almost $12,000 in assessment fees and costs. Although Multani disputed the Association's accounting, he agreed to pay the full amount and the Association released the assessment lien.

Shortly after the lien was released, Multani contacted the Association and "requested that his account be given . . . credit f[or] . . . previously non-credited payments." Between April and July of 2007, Multani continued to make his "required monthly assessment payments, but was never given the credit due on the account." In February of 2008, the Association recorded a second notice of delinquent assessment lien against the property and, in June, recorded a "Notice of Default and Lien." Six months later, on December 5, 2008, the Association and its trustee, Witkin & Neal, "set a sale date of the property to take place on January 27, 2009." Multani "sent a letter disputing the validity of the amount owed" and requested alternative dispute resolution. The Association did not respond.

3

On January 5, 2009, "Indymac [Bank], the lender and beneficiary of the senior deed of trust [on the condominium unit], mistakenly instructed their [sic] trustee to foreclose . . . on the property." Plaintiffs immediately filed a wrongful foreclosure action and Indymac agreed to issue a notice of rescission of foreclosure, which was recorded on April 28, 2009. Plaintiffs contended that Indymac's actions had effectively "extinguish[ed] [the Association's] lien and its Notice of Trustee's Sale," thereby requiring the Association to reinitiate the foreclosure process by recording a new lien.

The Association, however, elected to proceed and directed Witkin & Neil to record the notice of trustee sale set for January 27, 2009. In May of 2009, Multani informed the president of the Association, Randy Banks, that he "ha[d] been trying for some time to correct and rectify what seemed an impossible task of getting a [sic] accurate accounting on Plaintiffs' account and getting the proper credits that were due." Banks told Multani that he was unaware of the accounting discrepancies and would "provide assistance . . . with the outstanding issues regarding the [improper] Association assessments."

Despite these assurances, on May 21, 2009, the Association placed a notice on the door of the Multanis' condominium stating that they owed $13,640 for delinquent assessments and costs. Shortly after the notice was posted, the Multanis' tenants informed them that the locks on the condominium unit had been changed. When Multani arrived at Castle Green to investigate the matter, he was met by Banks, who said that he had contacted the police and that Multani would be arrested if he did not leave the premises. Although Multani informed the responding officers that he was the legal owner of the condominium, he was forced to leave the building. Between May and October of 2009, Banks and other Association members continued to "harass[] Plaintiffs' tenants," causing them to vacate the condominium.

On July 23, 2009, the Association conducted a foreclosure sale of the Multanis' condominium, which was purchased by ProValue Properties. Although the "property was estimated to be valued at approximately $400,000," ProValue paid only $20,400, subject to Indymac Bank's $75,000 deed of trust. The Association and its trustee never

4

notified the Multanis that the sale had been postponed from January 27 to July 23, nor did they provide any notice after the sale was completed.

In October of 2009, the Multanis signed a lease with new tenants who moved into the condominium. However, on November 19, the Multanis received a courtesy copy of an unlawful detainer complaint from the Los Angeles Superior Court stating that: (1) a nonjudicial foreclosure of the condominium had occurred on July 23, 2009; (2) although originally scheduled to occur on January 27, 2009, the Association's trustee had "from time to time postponed" the sale until July 23; and (3) a trustee deed of sale had been recorded on October 24, 2009, which was 90 days after the plaintiffs' "right to redemption" had expired. Prior to receiving the unlawful detainer complaint, the plaintiffs were unaware of the foreclosure sale.

In November and December of 2009, ProValue repeatedly changed the locks on the condominium unit. Multani and his tenants had several disputes with ProValue, culminating in an altercation on December 17, 2009. Based on misrepresentations made by ProValue, the Pasadena police told Multani that he had to vacate the condominium by the end of the weekend or he would be arrested for trespassing. After being repeatedly harassed and threatened with arrest, Multani finally relinquished possession of the unit and elected to file a lawsuit against the Association, its agents – Witkin & Neal, SBS Lien Services and LB Property Management – and numerous other parties, including ProValue.

### 2. *Summary of plaintiffs' claims*

The Multanis' complaint asserted numerous claims seeking to set aside the foreclosure, including: quiet title, wrongful foreclosure, rescission and declaratory relief. The Multanis alleged that the foreclosure was improper because the Association and its agents (collectively defendants) had failed to properly serve the notice of trustee sale or comply with other procedural requirements mandated under Civil Code section 2924, *et seq*. Plaintiffs also alleged that the defendants had failed to comply with "Civil Code section 1367 *et seq*.," which imposes additional procedural requirements on nonjudicial

5

foreclosures conducted by homeowner associations for delinquent assessment fees. More specifically, plaintiffs alleged that the defendants "failed to provide alternate dispute resolution as required by [Civil Code section 1367.4]." The Multanis further asserted that all of the defendants' foreclosure notices had been "effectively voided" when "Indymac Bank . . . conducted their non-judicial foreclosure sale of January 2009 and recorded the Deed Upon Sale."

In addition to the foreclosure claims, the complaint alleged several tort claims based on the defendants' actions during the foreclosure process. Plaintiffs asserted claims for fraud, breach of fiduciary duty and intentional infliction of emotional distress alleging that the defendants had: (1) "intentionally mixed up the accounting of Plaintiffs' dues, imposed unwarranted dues and other charges, and confused Plaintiffs as to what was actually going on by repeated filings of notices, liens, and releases of liens by Defendants"; (2) "intentionally did not properly credit Plaintiffs' account so as to further extract additional monies in the form of collections costs, attorneys fees and late penalties"; and (3) "conspired to conduct a [nonjudicial foreclosure] sale without any notice to prevent Plaintiffs from opposing such sale."

The complaint also asserted claims for interference with contractual relations and interference with prospective economic advantage, which were predicated on the defendants' harassment of the plaintiff's condominium tenants. The complaint listed numerous additional statutory claims based on similar conduct, including violation of the Unruh Civil Rights Act (Civ. Code, §§ 51 *et seq.*), violation of the Fair Debt Collection Practices Act (Civ. Code, §§ 1788 *et seq.*), violation of the federal Racketeer Influence and Corrupt Organization Act (18 U.S.C §§ 1961 *et seq.*) (RICO) and unfair business practices.

6

### B. *Defendants' Motion for Summary Judgment or Summary Adjudication*

#### 1. *Defendants' motion and supporting evidence*

##### a. *Summary of motion for summary judgment or adjudication*

In June of 2011, the Association and its agents filed a motion for summary judgment or, alternatively, summary adjudication. First, defendants asserted that the undisputed evidence showed the Multanis had "violated the 'tender rule' by failing to tender the full amount before the foreclosure sale." Second, defendants argued that they had provided evidence demonstrating substantial compliance with all statutory notice requirements. Third, defendants contended that plaintiffs were not harmed by any alleged procedural irregularity because they had actual notice that the foreclosure sale was scheduled to occur on January 27, 2009. Fourth, defendants argued that, pursuant to Civil Code section 1058.5, Indymac Bank's rescinded January 5th foreclosure had no effect on the Association's foreclosure.[2]

As to plaintiffs' tort claims, the defendants argued that all of the conduct alleged in the complaint was related to the "processing of [a] . . . foreclosure" and was therefore "covered by the Civil Code Section 47(b) absolute privilege." The Association also argued that the allegations in the complaint demonstrated that plaintiffs' interference claims were time barred.

The Association's agents, Witkin & Neil and LB Management, separately argued that all of the tort claims asserted against them should be dismissed because they were entitled to qualified immunity under Civil Code section 2924, subdivision (b) and defendants had "failed to articulate the alleged bad acts committed by [them]."

##### b. *Summary of evidence filed in support of defendants' motion*

In support of their motion, the defendants submitted a declaration from the chief operating officer of Witkin & Neal summarizing the actions the trustee had taken during

---

2 Civil Code section 1058.5, subdivision (b) states, in relevant part: "Where a trustee's deed is invalidated by a pending bankruptcy or otherwise, recordation of a notice of rescission of the trustee's deed . . . shall restore the condition of record title to the real property described in the trustee's deed and the existence and priority of all lienholders to the status quo prior to the recordation of the trustee's deed upon sale . . . ."

7

the foreclosure proceedings. According to the declaration, on April 21, 2008, Witkin & Neal mailed the plaintiffs a "pre-notice" of default letter informing them that a notice of delinquent assessment had been recorded against the property and that the current amount due on the account was $4,206.40. The letter further stated that the plaintiffs had the right to "dispute the assessment debt by submitting a written request for dispute resolution." A declaration of mailing indicated that the letter was sent to the Multanis' condominium unit and a Pasadena post office box numbered "82341."

The declaration also stated that, on June 23, 2008, Witkin & Neal mailed the plaintiffs a notice of default and election to sell stating that the amount currently due totaled $5,494.73 and would continue to "increase until [the] account bec[a]me current." A declaration of mailing indicated that the notice was sent to the same two addresses as the "pre-notice" letter and to a second Pasadena post office box numbered "92341." On January 9, 2009, Witkin & Neal sent the plaintiffs a notice of trustee's sale informing them that: (1) the sale was scheduled to occur on January 27, 2009; (2) the total unpaid balance was currently $10,267.62; and (3) the foreclosure sale was subject to a 90-day redemption period during which the owners could reclaim the property. A declaration of mailing indicated that the notice was sent to the same three addresses as the notice of default.

The declaration further alleged that, "at the time and place fixed in the Notice of Trustee's Sale, [Witkin & Neal] did, by public announcement, and in a manner provided by law, postpone the sale date from time to time thereafter until July 23, 2009, when [Witkin & Neal] sold the Subject unit to ProValue Properties . . . for the sum of $20,200." On July 31, 2009, defendants recorded a certificate of sale confirming that that the property was sold to ProValue and that the sale was subject to a 90-day "right of redemption." According to the declaration, plaintiffs "made no attempt to tender the full amount before the foreclosure sale date" and "failed to redeem the Subject Property during the 90-day right of redemption period." At the expiration of the 90-day redemption period, Witkin & Neal recorded a Trustee's Deed Upon Sale, dated November 6, 2009.

8

The defendants also submitted excerpts from Rahim Multani's deposition in which he admitted that he stopped paying his assessment fees because he "felt that [a] claim of overpayment was not being handled correctly." According to Multani, "no one gave [him] a correct accounting or breakdown of what the actual outstanding amount was owed." Multani alleged that, in 2008, he had tried to pay the amount that he believed he owed but the Association rejected his payments. Thereafter, Multani made a "conscious decision" not to pay the "entire asserted balance" because he believed it was incorrect and was "always a moving target." Multani also testified that, prior to December 16, 2009, he was unaware that the Association had actually held a foreclosure sale.

### 2. *Plaintiffs' opposition and supporting documentation*

On August 10, 2011, plaintiffs submitted an opposition arguing that there were disputed issues of material fact as to whether the defendants had complied with all of the mandated procedural requirements. Plaintiffs argued, in relevant part, that: (1) "[d]efendants failed to provide notice to Plaintiffs for the secret sale [that occurred on July 23, 2009]"; (2) defendant failed to respond to Rahim Multani's letter dated December 2008, in which he specifically requested alternative dispute resolution; and (3) Indymac's subsequently rescinded foreclosure "extinguished" any prior notices the Association had issued in relation to their own foreclosure. The plaintiffs also argued that they were excused from complying with the tender rule because they had disputed "the validity of the underlying debt."

As to the tort claims, plaintiffs asserted that their complaint alleged numerous forms of non-communicative conduct that were not privileged under Civil Code section 47 subdivision (b), including allegations that the defendants had unlawfully harassed Multani and his tenants and repeatedly changed the locks on the condominium unit.

In support of their opposition, plaintiffs submitted a 14-page declaration from Rahim Multani that contained a detailed discussion of the accounting dispute that preceded the Association's recording of the delinquency lien. Multani asserted that, in June of 2007, he paid the Association almost $12,000 to resolve a prior payment dispute

9

that had begun in 2005, but that the defendants failed to properly credit him for two prior payments totaling approximately $1,500 and then began to intentionally inflate their monetary claims. Multani alleged that, on December 22, 2008, he sent the Association board a letter in which he disputed the amount that he owed and requested alternate dispute resolution. The Association, however, never responded to the letter.

Multani's declaration admitted that he knew defendants had scheduled a foreclosure sale for January 27, 2009, but asserted that he was led to believe the sale had been cancelled. Multani explained that, one day prior to the scheduled sale date, his attorney informed Witkin & Neal that Indymac Bank had foreclosed on the property two weeks earlier. In response, Witkin & Neal allegedly stated "if that was the case, then there would be no sale taking place the next day." According to Multani, Witkin & Neal never indicated that it might postpone the foreclosure sale, but then "surreptitious[ly]" sold the property to ProValue on July 23, 2009. Multani further stated that, after this "secret" sale occurred, the defendants failed to provide him a notice of his right to redemption as required under Code of Civil Procedure section 729.050.[3]

Multani also asserted that, during the foreclosure sale, the defendants committed numerous "criminal acts by changing the locks on the Subject property . . . ; calling the Pasadena Police Department on more than one occasion to attempt to prevent [him] from [entering the subject property]; improperly having [him] detained; and attempt[ing] to place [him] under citizen's arrest for trespassing . . . ."[4]

### C. The trial court's ruling

At the hearing, the plaintiffs argued that defendants had sent many of the foreclosure notices to the wrong address. According to the plaintiffs' attorney, Rahim

---

3    Unless otherwise noted, all further statutory citations and references are to the Code of Civil Procedure.

4    The defendants filed objections to numerous aspects of Rahim Multani's deposition. The record, however, does not indicate whether the court ruled on the objections, and defendants have not asserted there were any erroneous evidentiary rulings.

10

Multani's proper mailing address was post office box number 92341, but the defendants had sent several of the notices to post office box number 82341.  Plaintiffs counsel further argued that the proper address had been on file with the Association but, "at some point[,] the homeowners association started sending it to the wrong P.O. box."

In response, defendants' attorney argued that they had submitted several recordation of mailings in support of their motion showing that most of the notices had in fact been sent to post office box 92341.  Counsel also argued that it was irrelevant whether the defendants had mailed the notices to the correct address because plaintiffs had admitted they "had actual knowledge of the [foreclosure] process."  After the court informed the parties that it was going to take the matter under submission, the following exchange occurred:

PLAINTIFFS' COUNSEL:  Your honor, can I just ask the court to take a look at [section] 729.050.

COURT:  And what is it?

PLAINTIFFS' COUNSEL:  That talks about the requirements.  Their certificate of sale.

COURT:  Oh yeah, I'm going to look at that.

On August 23, 2011, the trial court filed an order granting judgment in favor of Witkin & Neal and LB Property Management and granting the Association judgment on twelve of the fifteen remaining claims pleaded against it.[5]  The court concluded that the defendants were entitled to judgment on each of the four claims seeking to set aside the foreclosure because plaintiffs had admitted that they "failed to tender the amount of the debt prior to the sale or exercise [their] right[s] of redemption after the sale."[6]

---

5       The record indicates that, several months prior to the hearing on the motion for summary judgment or adjudication, the trial court had sustained a demurrer to plaintiffs' claims alleging violations of the Fair Debt Collection Practices Act and RICO. Appellants do not challenge that ruling.

6       Plaintiffs sought to set aside the foreclosure in four separate claims: declaratory relief, quiet title, wrongful foreclosure and rescission.  We refer collectively to these four claims as the "foreclosure claims" or as "claims seeking to set aside the foreclosure."

11

In addition, the court concluded that the following evidence demonstrated that plaintiffs were not "prejudice[ed]" by any "procedural irregularity" in the foreclosure proceedings: (1) prior to recording the notice of delinquent assessment, the Association sent plaintiffs a letter advising them of their right to alternative dispute resolution; (2) Witkin & Neal's declaration demonstrated that defendants had properly complied with all statutory requirements when postponing the foreclosure sale from January 27, 2009 to July 23; 2009; and (3) plaintiffs admitted they had "actual knowledge of the foreclosure proceedings" and, "[d]espite such knowledge, [had] failed to exercise their 90-day statutory right of redemption."

The trial court also concluded that the defendants' evidence showed that four notices had been sent to the plaintiffs' condominium unit and post office box 82341: (1) a notice to pay or lien, dated December 27, 2007; (2) a notice of delinquent assessment liens, which had been sent on February 28, 2008 and again on April 21, 2008; (3) a notice of default and election to sell, dated June 13, 2008; and (4) a notice of trustee's sale, dated October 31, 2009. The latter two items were also sent to post office box 92341, which Multani had alleged to be his proper mailing address. The court further noted that plaintiffs had never specifically alleged that they did not receive any of these four items.

On the tort-based claims, the court ruled that the defendants were entitled to dismissal of the fifth cause of action (fraud), eighth cause of action (breach of fiduciary duty) ninth cause of action (intentional infliction of emotional distress) and the eighteenth cause of action (unfair business practices) because each of those claims was predicated on "actions . . . subject to immunities set forth in [Civil Code sections] 47 and 2924(b)." In addition, the court ruled that plaintiffs' thirteenth through sixteenth claims, which alleged interference with contractual relations and prospective economic advantage, were "time-barred."

The court entered judgment in favor of Witkin & Neal and LB Property Management on September 12, 2011. Three claims, however, remained pending against

Plaintiffs also pleaded a claim for cancellation of deed against ProValue, which is not a party to this appeal.

the Association: violation of the Unruh Civil Rights Act, forcible detainer and a request for an accounting.

On September 23, the Association moved for judgment on the pleadings seeking dismissal "of these remaining claims . . . such that judgment [may be] entered in favor of the Association." The trial court granted the motion on October 19, 2011 and entered a final judgment in favor of the Association on November 9, 2011. Plaintiffs filed a timely appeal of the trial court's judgment and order granting the defendants' motion for summary judgment or adjudication.[7]

## DISCUSSION

### A. *Standard of Review*

"'The standard for deciding a summary judgment motion is well-established, as is the standard of review on appeal.' [Citation.] 'A defendant moving for summary judgment has the burden of producing evidence showing that one or more elements of the plaintiff's cause of action cannot be established, or that there is a complete defense to that cause of action. [Citation.] The burden then shifts to the plaintiff to produce specific facts showing a triable issue as to the cause of action or the defense. [Citations.] Despite the shifting burdens of production, the defendant, as the moving party, always bears the ultimate burden of persuasion as to whether summary judgment is warranted. [Citations.]' [Citation.]" (*Hypertouch, Inc. v. ValueClick, Inc.* (2011) 192 Cal.App.4th 805, 817 (*Hypertouch*).)

"'On appeal, we review de novo an order granting summary judgment. [Citation.] The trial court must grant a summary judgment motion when the evidence shows that there is no triable issue of material fact and the moving party is entitled to judgment as a

---

[7]     Plaintiffs' notice of appeal and portions of their appellate brief also allude to the trial court's order granting the Association's motion for judgment on the pleadings. As discussed in more detail below, however, the brief contains insufficient legal analysis of any of the three claims dismissed in that order. Plaintiffs have therefore abandoned any claim of error regarding the trial court's order granting defendants' motion for judgment on the pleadings. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 (*Reyes*).)

13

matter of law. [Citations.] In making this determination, courts view the evidence, including all reasonable inferences supported by that evidence, in the light most favorable to the nonmoving party. [Citations.]' [Citation.]" (*Hypertouch, supra*, 192 Cal.App.4th at p. 818.) "The same standards apply to motions for summary adjudication." (*Id*. at p. 817, fn. 3.)

## B. *Defendants Failed to Satisfy Their Initial Burden of Production on Plaintiffs' Foreclosure Claims*

The plaintiffs argue that the trial court erred in dismissing each of their claims seeking to set aside the foreclosure sale because there are triable issues of fact as to whether defendants complied with numerous procedures required under the Civil Code and the Code of Civil Procedure. We reverse the trial court's dismissal of the foreclosure claims, concluding that defendants failed to demonstrate that they notified plaintiffs of their right to redemption or the applicable redemption period as required under section 729.050.[8]

### 1. *The post-sale right to redemption in nonjudicial foreclosures by a homeowner association for delinquent assessment fees*

Special procedures govern nonjudicial foreclosures initiated by a homeowner association for the collection of delinquent assessment fees. Under the Davis-Stirling Common Interest Development Act (see Civ. Code, § 1350 *et seq*.) (the Act), which governs common interest developments (CID) in California,[9] the amount of any unpaid association assessment, plus the reasonable costs of collection, late charges, and interest, constitutes a "debt of the owner of the separate interest." (Civ. Code, § 1367.1, subd. (a); Civ. Code, § 1366, subds. (e)(1)-(3).) After complying with various notice requirements

---

8      The plaintiffs raise numerous additional arguments as to why we should reverse the trial court's dismissal of their foreclosure claims. Because we reverse the dismissal of those claims based on defendants' failure to provide evidence demonstrating compliance with section 729.050, we need not address plaintiffs' additional arguments.

9      The parties do not dispute that the Multanis' condominium unit was part of a common interest development governed by the Act.

14

(see Civ. Code, § 1367.1, subds. (a)-(c)), an association may record a lien of delinquent assessment against the property (see Civ. Code, § 1367.1, subd. (e)) and then enforce the lien through a nonjudicial foreclosure "conducted in accordance with [Civil Code] [s]ections 2924, 2924b and 2924c applicable to the exercise of powers of sale in mortgages and deeds of trust." (Civ. Code, § 1367.1, subd. (g).)

As a general rule, the debtor in a nonjudicial foreclosure may avoid the loss of the property by "pay[ing] all amounts due at any time prior to the sale . . ." (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 86-87 (*Knapp*).) However, "[o]nce the sale is completed, the trustor has no further rights of redemption." (*Id.* at p. 831.) Prior to 2006, these same rules applied to nonjudicial foreclosures by an association for delinquent assessments.

In 2005, however, the Legislature adopted S.B. 137 (2005 Stats., c. 452 (S.B. 137), § 5), which placed numerous limitations on an association's ability to utilize foreclosure as a means to collect assessments. The legislative history indicates that S.B. 137 was intended to "institute . . . important procedural . . . requirements to protect CID homeowners" from the "extreme hammer of non-judicial foreclosure in order to collect relatively small amounts of overdue assessments." (California Bill Analysis, S.B. 137 Assembly Fl. (2005-2006 Reg. Sess.) September 1, 2005.) Supporters of the Bill argued that there had been "too many instances" in which "CID associations [had] . . . initiated [foreclosures] for relatively small amounts . . ., [and then] sold [the property] for an all-too-often shockingly small fraction of its actual value." (*Ibid.*) The bill sought to avoid similar outcomes in the future by providing "CID homeowners" additional "due process protections." (*Ibid.*)

S.B. 137 added Civil Code section 1367.4, which prohibits (with certain exceptions) the use of foreclosure to collect delinquent assessments that total less than $1,800. (Civ. Code, § 1367.4, subd. (b).) Although the statute permits an association to "use . . . nonjudicial foreclosure" for delinquent assessments exceeding $1,800 (see Civ. Code, § 1367.4, subd. (c)), section 1367.4, subdivision (c)(4) requires that the association provide CID owners a right to redeem the property within 90 days after the sale: "A

15

nonjudicial foreclosure by an association to collect upon a debt for delinquent assessments shall be subject to a right of redemption. The redemption period within which the separate interest may be redeemed from a foreclosure sale under this paragraph ends 90 days after the sale. . . ." A similar provision appears in section 729.035, which was also added as part of S.B. 137: "Notwithstanding any provision of law to the contrary, the sale of a separate interest in a common interest development is subject to the right of redemption within 90 days after the sale if the sale arises from a foreclosure by the association of a common interest development pursuant to subdivision (g) of Section 1367.1 of the Civil Code, subject to the conditions of Section 1367.4 of the Civil Code."[10]

The redemption process, which is normally available only in the context of judicial foreclosure, is governed by requirements set forth in the Code of Civil Procedure.[11] Section 729.040 mandates that, following a foreclosure subject to a right of redemption, the trustee must deliver a "certificate of sale" to the purchaser and record a duplicate of the certificate in the office of the county recorder. Under section 729.050,

---

10   Civil Code section 1367.4 imposes various other conditions on an association's use of nonjudicial foreclosure. First, "prior to initiating the foreclosure," the association must "offer the owner and, if so requested by the owner, participate in" various, enumerated forms of alternative dispute resolution, including binding arbitration. (Civ. Code, § 1367.4, subd. (c)(1).) Second, the statute requires that the decision to initiate foreclosure must be made by the association's board of directors in an open vote. (Civ. Code, § 1367.4, subd. (c)(2).) Third, the board must provide the owner notice of its decision. (Civ. Code, § 1367.4, subd. (c)(3).)

11   A judicial foreclosure involves significant "court oversight" (*Arabia v. BAC Home Loans Servicing, L.P.* (2012) 208 Cal.App.4th 462, 470) and provides the creditor and the debtor certain rights that are generally not available in nonjudicial foreclosure: "In a judicial foreclosure, if the property is sold for less than the amount of the outstanding indebtedness, the creditor may seek a deficiency judgment, or the difference between the amount of the indebtedness and the fair market value of the property, as determined by a court, at the time of the sale. [Citation.] However, the debtor has a statutory right of redemption . . . for a period of time after foreclosure. [Citation.]" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1236 (*Alliance*).) By contrast, in a nonjudicial foreclosure, there "is no oversight by a court, . . . the debtor has no postsale right of redemption[,] . . . and the creditor may not seek a deficiency judgment." (*National Enterprises, Inc. v. Woods* (2001) 94 Cal.App.4th 1217, 1226.)

16

the trustee must also promptly notify the debtor of his redemption rights: "If property is sold subject to the right of redemption, promptly after the sale the levying officer or trustee who conducted the sale shall serve notice of the right of redemption on the judgment debtor. Service shall be made personally or by mail. The notice of the right of redemption shall indicate the applicable redemption period."

Sections 729.060-729.090 describe how the debtor may redeem his or her property following the foreclosure sale. "[S]ection 729.060, subdivision (a) requires '[a] person who seeks to redeem the property [to] deposit the redemption price with the levying officer who conducted the sale before the expiration of the redemption period.' Subdivision (b) of this statute defines the redemption price as 'the total of the following amounts . . . . [¶] (1) The purchase price at the sale. [¶] (2) The amount of any assessments or taxes and reasonable amounts for fire insurance, maintenance, upkeep, and repair of improvements on the property. [¶] (3) Any amount paid by the purchaser on a prior obligation secured by the property to the extent that the payment was necessary for the protection of the purchaser's interest. [¶] (4) Interest on the amounts described in paragraphs (1), (2), and (3) . . . .' In addition, subdivision (c) of . . . section 729.060 authorizes an offset to the redeeming party for '[r]ents and profits from the property paid to the purchaser or the value of the use and occupation of the property to the purchaser . . . .'" (*Barry v. OC Residential Properties* (2011) 194 Cal.App.4th 861, 866 (*Barry*).)

Section 729.070 establishes "a procedure allowing one 'seeking to redeem the property [who] disagree[s with the purchaser's claimed] redemption price' to petition 'the court for an order determining the redemption price . . .' [Citation.]" (*Barry, supra,* 194 Cal.App.4th at pp. 866-867.) If the debtor does not deposit the redemption price or otherwise file a petition challenging the redemption price within the applicable redemption period, the trustee must deliver an executed trustee's deed to the purchaser and provide the debtor notice that the trustee sale has occurred. (§ 729.080, subd. (a).) If, however, the debtor tenders "the redemption price determined by court order or agreed upon by the purchaser . . . the effect of the sale is terminated and the person who

17

redeemed the property is restored to the estate therein sold at the sale." (§ 729.080, subd. (b).)

### 2. *Defendants failed to make a prima facie showing that plaintiffs cannot establish the elements necessary to set aside the foreclosure sale*

Plaintiffs contend that the trial court erred in dismissing their foreclosure claims because the defendants failed to notify them of their right of redemption as required under section 729.050.

#### a. *Defendants have waived any argument regarding plaintiffs' failure to plead a violation of section 729.050*

Before addressing the merits of this argument, we assess defendants' contention that we should "disregard[]" this "alleged [procedural] violation" because it "is outside the scope of the Second Amended Complaint."

Generally, "[a] defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers. [Citation.]" (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98, fn. 4.) Defendants assert that, in this case, plaintiffs' "allegation that [the Association and its trustee] somehow violated . . . [s]ection 729.050 . . . . does not exist in the [second amended complaint]," which prohibits them from raising the issue on appeal.

Plaintiffs' complaint, however, alleges that the defendants "conducted the foreclosure proceedings unlawfully in that they did not follow the California non-judicial  foreclosure sale procedures prescribed by . . . Civil Code § 2924 and 1367." The complaint also alleges violation of "§ 1367 *et seq*." As discussed above, Civil Code section 1367.4, subdivision (c)(4) requires the association to provide CID owners a 90-day period to redeem the property, which triggers the trustee's notice requirements under section 729.050.

In any event, defendants have forfeited this issue. When a plaintiff opposes a motion for summary judgment or adjudication by raising an "unpleaded issue," the

18

defendant's failure to "object to [the] injection of [the] unpleaded theory . . . [constitutes a] waive[r]." (*Knapp, supra,* 123 Cal.App.4th at p. 90; see also *Stalnaker v. Boeing Co.* (1986) 186 Cal.App.3d 1291, 1302.) The purpose of this objection requirement is to ensure that, if the objection is sustained, the plaintiff has an opportunity to request leave to amend the pleading to raise the unpleaded theory. (See *Stalnaker, supra,* 186 Cal.App.3d at p. 1302.)

In the trial court, plaintiffs' opposition papers included a declaration from Rahim Multani in which he alleged that defendants did not comply with section 729.050's notice requirements. Although the defendants objected to numerous statements in Multani's declaration on the ground that they introduced issues outside the pleadings, defendants did not raise this objection in regards to Multani's statements about section 729.050. Moreover, during oral argument, the plaintiffs' attorney specifically requested that the trial court review section 729.050 and determine whether defendants had demonstrated compliance with its requirements. The defendants did not object to this request and the trial court agreed that it would consider the issue. Under these circumstances, "we deem waived defendants' objection to plaintiffs' . . . mode of pleading and argument." (*Stalnaker, supra,* 186 Cal.App.3d at p. 1302, fn. 7 [finding waiver where "the newly introduced theory was . . . presented to the trial court, without defendants' objection"].)

### b. *Defendants failed to make a prima facie showing that they were entitled to dismissal of plaintiffs' claims seeking to set aside the foreclosure*

As the party moving for summary adjudication of plaintiffs' foreclosure claims, the defendants had the "'initial burden of production to make a prima facie showing" that "one or more elements of the plaintiff's cause of action cannot be established." (*Hypertouch, supra,* 192 Cal.App.4th at p. 838.)

"The rights and powers of trustees in nonjudicial foreclosure proceedings have long been regarded as strictly limited and defined by the contract of the parties and the statutes." (*I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 287.) "Because nonjudicial foreclosure is a 'drastic sanction' and a 'draconian remedy' [citation], "'[t]he

19

statutory requirements must be strictly complied with, and a trustee's sale based on statutorily deficient notice of default is invalid."' [Citations]." (*Ung v. Koehler* (2005) 135 Cal.App.4th 186, 202-203; see also *Holland v. Pendleton Mortg. Co*. (1943) 61 Cal.App.2d 570, 573-574 [foreclosure sale invalid where trustee fails to comply with statutory notice procedures]; 4 Miller & Starr, Cal. Real Est. (3d ed. 2011) § 10:210 ["A sale of the collateral by an exercise of the power of sale in violation of the statutory limitations on the power is invalid"].)

To set aside a foreclosure, a plaintiff must generally establish three elements: "(1) the trustee . . . caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale . . . was prejudiced or harmed; and (3) in cases where the trustor . . . challenges the sale, the trustor . . . tendered the amount of the secured indebtedness or was excused from tendering." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 104 (*Lona*).) The defendants argue that their moving papers made a prima facie showing that plaintiffs cannot establish any of these three elements.

### i. *Defendants introduced no evidence that they complied with section 729.050*

"Justifications . . . which satisfy the first element [to set aside a foreclosure] include the trustee's . . . failure to comply with the statutory procedural requirements for the notice or conduct of the sale." (*Lona, supra*, 202 Cal.App.4th at p. 104.) Although there is generally no "postsale right of redemption" in nonjudicial foreclosure proceedings (*Alliance, supra,* 10 Cal.4th at p. 1236), a nonjudicial foreclosure by an association for delinquent assessments is "subject to the right of redemption within 90 days after the sale." (§ 729.035; see also Civ. Code, § 1367.4, subd. (c)(4).) As a result, the trustee who conducts the sale must "promptly . . . serve notice of the right of redemption on the judgment debtor," which "shall indicate the applicable redemption period." (§ 729.050.)

Defendants have failed to provide any evidence that they complied with this statutory requirement. In support of their motion for summary adjudication, the

defendants submitted evidence that they mailed the Multanis the following notices regarding the foreclosure proceedings: (1) a "pre-notice of Default letter," mailed April 21, 2008; (2) a "Notice of Default and Election to Sell," mailed June 23, 2008; (3) a "Notice of Board Decision to Foreclose and Notice of Default," mailed October 7, 2008; and (4) a "Notice of Trustee's Sale," mailed January 9, 2009. The defendants also submitted evidence that, following the foreclosure sale, the trustee recorded a "Certification of Sale" on July 31, 2009 and then recorded the "Trustee's Deed Upon sale . . . [a]fter the 90-day right of redemption period expired."

Defendants, however, have cited no evidence in the record – and we have located none – demonstrating that it mailed the Multanis a notice of right to redemption as required under section 729.050. Instead, defendants contend that they had no burden to present evidence that they complied with section 729.050 because "[a] nonjudicial foreclosure sale is accompanied by a common law presumption that it 'was conducted regularly and fairly.' [Citations.]" (*Lona, supra*, 202 Cal.App.4th at p. 105.) Defendants appear to assert that this presumption was, standing alone, sufficient to "'to make a prima facie showing'" (*Hypertouch, supra,* 192 Cal.App.4th at p. 839) that plaintiff could not demonstrate any procedural irregularity in the foreclosure proceedings.

The defendants have not cited any authority indicating that this common law presumption of regularity applies to the postsale redemption procedures at issue here. All of the cases they cite applied the presumption in the context of standard nonjudicial foreclosures that were not subject to statutory redemption. Even if the common law presumption were to apply to redemption procedures, however, a defendant moving for summary adjudication of claims seeking to set aside a foreclosure may not discharge his or her initial burden of production by merely referencing the presumption. The presumption, which is rebuttable (see *6 Angels, Inc. v. Stuart-Wright Mortgage, Inc.* (2001) 85 Cal.App.4th 1279, 1284), merely requires that the party "attacking the sale . . . [must] 'plead[] and prove[] an improper procedure and resulting prejudice' [Citation.]" (*Knapp, supra,* 123 Cal.App.4th at p. 86, fn. 4.) Thus, the plaintiff has the burden to

21

allege in its pleading that a prejudicial irregularity occurred and then to prove that allegation at trial.

For the purposes of summary judgment or adjudication, however, defendants still must make a prima facie showing that plaintiffs could not prove that any irregularity occurred. This initial burden required defendants here to "present evidence" that they complied with the statutory procedures applicable to this foreclosure. (*Hypertouch, supra*, 192 Cal.App.4th at p. 838.) Their failure to do so means that they failed to "conclusively negate[]" the first element of plaintiffs' foreclosure claims. (*Ibid*.)

### ii. *Defendants did not make a prima facie showing that plaintiffs suffered no harm from the procedural defect*

The second element necessary to set aside a foreclosure requires the plaintiff to show that he or she was "prejudiced or harmed" by defendants' failure to comply "with the procedural requirements for the foreclosure sale." (See *Lona, supra,* 202 Cal.App.4th at p. 104 ["to challenge a sale successfully there must be evidence of a failure to comply with the procedural requirements for the foreclosure sale that caused prejudice to the person attacking the sale"].)

Section 729.050's notification requirement serves two purposes. First, it ensures that the debtor is aware that the property may still be redeemed. Second, it informs the debtor the date on which his or her redemption rights expire. Presumably, a debtor who has not received such notice has been harmed or prejudiced by the fact that they were not informed of those rights. (See *Residential Capital v. Cal-Western Reconveyance Corp*. (2003) 108 Cal.App.4th 807, 822 (*Residential Capital*) ["The inquiry is whether . . . there is a . . . defect in the statutory procedure that is prejudicial to the interests of the trustor and claimants"].)

Defendants, however, contend that no such prejudice occurred here because plaintiffs were provided enough information to independently calculate when their redemption period was set to expire. In support, defendants cite evidence indicating that, prior to the foreclosure sale, they provided plaintiffs a statutorily-required notice of intent

22

to sell stating that: (1) the foreclosure sale was scheduled to occur on January 27, 2009; and (2) the sale would be subject to a right of redemption that would end 90 days after the sale date. Defendants assert that, based on this information, plaintiffs could have determined when their right to redemption ended and therefore were not harmed by the trustee's failure to comply with section 729.050.

For the purposes of this appeal, we assume that defendants did in fact make a prima facie showing that they properly notified plaintiffs that the foreclosure sale was originally scheduled to occur on January 27 and that the sale would be subject to a 90-day right of redemption.[12] Such evidence, however, is insufficient to demonstrate that plaintiffs suffered no prejudice or harm from defendants' failure to comply with the notice requirements of section 729.050. Defendants' argument is predicated on the assumption that a debtor has an independent duty to calculate the applicable redemption period based on information received during the foreclosure process. Section 729.050, however, specifically relieves the debtor of any such burden by requiring the trustee to provide notice of the applicable redemption period promptly after the foreclosures sale.

This post-sale notice requirement is of heightened importance where, as here, the trustee postponed the original sale date without individualized notice to the debtor. Civil Code section 2924g permits a trustee to postpone a foreclosure sale for up to a year by making a public announcement "at the time and place last appointed for sale. . . . No other notice of postponement need be given." (Civ. Code, § 2924g, subd. (d).)[13] Although the foreclosure in this case was originally scheduled for January 27, 2009, the defendants' moving papers state that "[a]t the time and place fixed in the [notice of sale,

---

12      Plaintiffs argue that the notice of sale was ineffective because there is a triable issue of fact as to whether defendants sent it to the correct address. For the purpose of our analysis, however, we need not resolve that dispute.

13      The Civil Code has since been amended to require that, as of January 1, 2011, "whenever a sale is postponed for a period of at least 10 business days pursuant to Section 2924g, a mortgagee, beneficiary, or authorized agent shall provide written notice to a borrower regarding the new sale date and time, within five business days following the postponement." (Civ. Code, § 2924, subd. (a)(5).)

23

the trustee] did, by public announcement . . . postpone the sale date from time to time . . . until July 23." Defendants provided no evidence that they gave plaintiffs any notice regarding the postponements beyond the public announcement requirements described in Civil Code section 2924g. Thus, without the section 729.050 notice, plaintiffs could have only determined their applicable redemption period by attending each of the scheduled sale dates or otherwise researching when, exactly, the sale occurred. Again, section 729.050 relieved them of any such obligation.

Defendants' argument would also permit homeowner associations to ignore section 729.050 without consequence. The defendants were statutorily required to send the pre-sale notice that contained the information they now contend remedied any harm from their subsequent failure to comply with section 729.050. The Civil Code requires that, before conducting a foreclosure sale predicated on delinquent assessment fees, the association must provide a notice of sale that includes the date of the sale and a statement "that the property is being sold subject to the right of redemption." (Civ. Code, §§ 1367.4, subd. (c)(4); 2924b, subd. (b) and 2924f.) Thus, defendants are essentially arguing that a trustee who complies with this pre-sale notice requirement need not comply with section 729.050's post-sale notice requirement. This argument is the antithesis of the statutory scheme, which imposes a duty to provide a pre-sale notice referencing the right to redemption *and* a post-sale notice stating the applicable redemption period. The Legislature plainly concluded that, for the purpose of protecting a CID owner's due process rights, both forms of notice are necessary.

The primary authority defendants cite in support of their assertion that plaintiffs cannot establish harm is *Knapp, supra,* 123 Cal.App.4th 76, which held that "a slight deviation from statutory notice requirements" does not always require a court to "invalidate a foreclosure sale, where the trustee otherwise complies fully with the Civil Code." (*Id*. at p. 93.) The plaintiff in *Knapp* provided evidence that the defendant had served a notice of sale prematurely. Under the Civil Code, the trustee was required to comply with multiple timing requirements when serving the notice of sale: Civil Code section 2924 required the trustee to serve the notice no earlier than "'three months'

24

following recordation of the notice of default" (*id*. at p. 92), while section 2924b required that the trustee serve "the notice at least 20 days prior to the sale." (*Id*. at p. 88.) The court explained that the evidence showed the trustee "served the [s]ale [n]otice on . . . a date that was slightly less than three months after recordation of the [d]efault [n]otice," but 29 days prior to the sale date. (*Id*. at p. 92.) "Thus, while the [s]ale [n]otice did not comply fully with the three-month requirement under section 2924, it provided more than the 20 days notice mandated under section 2924b . . ." (*Ibid*.)

The court ruled that, under such circumstances, the foreclosure need not be set aside, concluding: "[T]he slight procedural irregularity in the service of the [s]ale [n]otice did not cause any injury to [b]orrowers. They had notice of the original sale date; the trustee's sale did not go forward until almost *one year after* the date noticed. There was no *prejudicial* procedural irregularity." (*Knapp, supra*, 123 Cal.App.4th at p. 94.) In the court's view, the "[b]orrowers' objection to the premature notice [wa]s, in effect, a criticism that the trustee provided *too much* notice of the sale. There [wa]s no evidence that they were prejudiced by the premature mailing of the notice. Given the fact that the trustee's sale did not occur until almost a year after service of the Sale Notice, it is difficult to imagine how Borrowers could claim any prejudice." (*Id.* at p. 96.)

In reaching its holding, the court specifically differentiated prior decisions setting aside foreclosure sales in which the debtor had been denied a "'substantial statutory right'" that was likely to result in prejudice. (*Knapp, supra*, 123 Cal.App.4th at p. 94.) According to the court, "no such substantial statutory right was abridged by trustee's premature mailing of the Sale Notice, which otherwise gave [b]orrowers adequate and timely notice of the trustee's sale." (*Ibid*.)

The facts in *Knapp* bear little resemblances to the facts in this case. The defendants' failure to comply with section 729.050 was not "a slight deviation from statutory notice requirements." (*Knapp, supra*, 123 Cal.App.4th at p. 93.) Defendants did not, as in *Knapp*, send a statutorily-required notice "slightly" prematurely; instead, the evidence suggests that they completely failed to send the notice required under section 729.050. Moreover, unlike in *Knapp*, defendants have provided no evidence that

25

plaintiffs were not harmed by the procedural defect. Nothing in the defendants' moving papers demonstrates that, despite the lack of section 729.050 notice, plaintiffs were actually aware of the date on which their redemption rights were set to expire but elected not to redeem. At most, defendants have shown that plaintiffs might have been able to calculate when their redemption rights expired based on information that was provided in other statutorily-mandated pre-sale notices.

In sum, the defendants have failed to make a prima facie showing that their failure to comply with section 729.050 was not "prejudicial to the interests of the . . . claimants." (*Residential Capital, supra,* 108 Cal.App.4th at p. 822.) Because the defendants have provided no evidence that plaintiffs were notified, or were otherwise aware of the actual date on which their right to redemption expired, we cannot conclude that plaintiffs suffered no prejudice.[14]

### iii. *Defendants failed to establish that the tender rule precluded plaintiffs from seeking to set aside the foreclosure sale*

The defendants argue that plaintiffs cannot satisfy the third element necessary to set aside a foreclosure sale, which requires a showing that "the trustor . . . tendered the amount of the secured indebtedness or was excused from tendering." (*Lona*, *supra*, 202 Cal.App.4th at p. 104.) Defendants assert that plaintiffs have admitted they never offered

---

14      Defendants also argue that plaintiffs were not harmed by the trustee's failure to comply with section 729.050 because, shortly after the foreclosure sale, the trustee recorded a certificate of sale referencing the date of the sale and the 90 day redemption period. According to defendants, the trustee's recording of the certificate provided plaintiffs "constructive notice of the right to redemption." This argument fails for the same reasons discussed above. First, the argument presumes that plaintiffs had a duty to monitor whether a certificate of sale was recorded against their property. The Legislature relieved CID owners of any such duty by requiring that the trustee provide notice of the redemption period promptly after the sale pursuant to section 729.050. Second, the trustee's act of recording a certificate of sale that included the sale date and a statement regarding the right to redemption was statutorily mandated under section 729.040. Thus, defendants argue that a trustee who complies with section 729.040's recording requirements need not comply with section 729.050's post-sale notice requirements. Such an outcome would be inconsistent with the legislative scheme.

to pay the full amount of the debt and are therefore precluded from challenging the foreclosure sale.

The tender requirement is rooted in the equitable nature of an action to set aside a nonjudicial foreclosure. "Because the action is in equity, a defaulted borrower who seeks to set aside a trustee's sale is required to do equity before the court will exercise its equitable powers. [Citation.] Consequently, as a condition precedent to an action by the borrower to set aside the trustee's sale on the ground that the sale is voidable because of irregularities in the sale notice or procedure, the borrower must offer to pay the full amount of the debt for which the property was security. [Citation.] 'The rationale behind the rule is that if [the borrower] could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the [borrower].' [Citation.]" (*Lona*, *supra*, 202 Cal.App.4th at p. 112.)

There are, however, several exceptions to the requirement. "First, if the borrower's action attacks the validity of the underlying debt, a tender is not required since it would constitute an affirmation of the debt. [Citation.] [¶] Second, a tender will not be required when the person who seeks to set aside the trustee's sale has a counter-claim or setoff against the beneficiary. In such cases, it is deemed that the tender and the counter claim offset one another, and if the offset is equal to or greater than the amount due, a tender is not required. [Citation.] [¶] Third, a tender may not be required where it would be inequitable to impose such a condition on the party challenging the sale [Citation.] . . . . [¶] Fourth, no tender will be required when the trustor is not required to rely on equity to attack the deed because the trustee's deed is void on its face. [Citation.]" (*Lona*, *supra*, 202 Cal.App.4th at pp. 112-113.)

As discussed above, a nonjudicial foreclosure by an association predicated on delinquent assessment fees is unique in that the CID owner is entitled to a post-sale right of redemption. (See Civ. Code, § 1367.4, subd. (c)(4); § 729.035.) Under these redemption rights, the property owner is entitled to receive notice of the applicable redemption period and then pay the redemption price or contest the redemption price through a judicial proceeding. (See §§ 729.050 -729.080.) Therefore, unlike most forms

27

of nonjudicial foreclosure, CID owners are provided an opportunity to avoid the loss of their property either by tendering the amount of the debt prior to the sale or paying the applicable redemption price – which consists of the purchase price and various other costs – after the sale.

Defendants assume, without discussion, that the tender requirement applies where, as here, the debtor is seeking to set aside a nonjudicial foreclosure subject to a statutory, post-sale right of redemption. Although we have found no authority analyzing the issue, we conclude that a debtor is properly excused from complying with the tender requirement where the nonjudicial foreclosure is subject to a statutory right of redemption and the trustee has failed to provide the notice required under section 729.050.

Applying the tender rule under such circumstances would be inconsistent with the statutory scheme. CID owners who were denied their statutory right to be notified of the redemption process could only challenge the denial of that right by offering to tender the amount of the secured debt. In other words, CID owners could only challenge an association's failure to provide notice of the redemption process by offering to forego the redemption process. Such an outcome would be neither logical nor equitable.

Defendants argue that even if plaintiffs were not required to tender the amount of the secured debt as a condition of bringing their suit, they were nonetheless required to tender the redemption price, thereby ensuring that they could have redeemed the property had section 729.050 been properly followed. Defendants' argument overlooks the fact that, under the statutory framework governing redemption, if the debtor and the purchaser disagree on the proper redemption price, the debtor may seek a judicial determination of the appropriate price. (See § 729.070.) Under defendants' theory, however, CID owners would have to affirm the purchaser's claimed redemption price through an offer of tender – thereby effectively waiving their right to seek a judicial determination of the redemption price – as a condition of challenging an association's failure to comply with section 729.050. Given that the tender rule is inapplicable where the debtor's action attacks the validity of the underlying debt, the rule should not be applied in a manner that

28

would require a CID owner who never received notice of his redemption rights to forego any challenge to the redemption price.

Because defendants failed to make a prima facie showing that plaintiffs cannot establish any of the three elements necessary to set aside the foreclosure, it is not entitled to summary adjudication on plaintiffs second, third, sixth or seventh causes of action.

### C. *Plaintiffs Have Forfeited Any Claim of Error Regarding Additional Causes of Action Pleaded in the Second Amended Complaint*

In addition to their four claims seeking to set aside the foreclosure, plaintiffs' second amended complaint asserts thirteen tort and statutory-based claims arising from various acts that defendants allegedly committed during the foreclosure process. The trial court dismissed all thirteen of these additional claims at various points in the proceedings. The court sustained a demurrer without leave to amend on two of the claims – violation of the Fair Debt Collection Practices Act and RICO – prior to the hearing on the motion for summary adjudication. The trial court's order granting defendants' motion for summary adjudication dismissed five of the claims – fraud, breach of fiduciary duty, intentional infliction of emotional distress and unfair business practices – on the basis that each claim was predicated on "actions . . . subject to immunities set forth in [Civil Code sections] 47 and 2924(b)." The summary adjudication order also dismissed plaintiffs' four interference claims, concluding that they were "time barred." Finally, the court dismissed the remaining three claims for violation of the Unruh Act, accounting and forcible detainer pursuant to an order granting defendants' motion for judgment on the pleadings.

Although a large majority of plaintiffs' 60-page brief argues that we should reinstate their foreclosure claims because there is evidence defendants committed various procedural irregularities, the final five pages of the brief asserts that their "claims for wrongful closure are not based on a communicative act" and are therefore not precluded under the "litigation privilege." (See Civ. Code, § 47, subd. (b).) In the course of this discussion, plaintiffs allude to various other claims in their complaint. Specifically,

29

plaintiffs assert that Civil Code "[s]ection 47(b)(2), does not bar Plaintiffs' cause of action for intentional interference with contractual relations because it is based upon an alleged tortious course of conduct.  While the isolated act of filing a notice of lien was communicative, it was only one act in the overall course of conduct alleged in Appellant's eight through twentieth causes of action."  This five-page section of the brief does not include a single citation to the record.

For the purposes of this appeal, we need not assess whether the litigation privilege applies to plaintiffs' claims seeking to set aside the foreclosure sale.  The trial court's order granting the motion for summary adjudication demonstrates that it dismissed those particular claims based on its finding that that plaintiffs had not complied with the tender rule and had not been prejudiced by any "procedural irregularity," not because the claims were precluded under the litigation privilege.  For the reasons discussed above, we have reversed the trial court's dismissal of those claims.

As to the remaining causes of action set forth in the second amended complaint, plaintiffs have forfeited any claim of error.  "[I]t is appellant's burden to affirmatively show error.  [Citation.]  To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error.  [Citations.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*).)  "Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.)  "Hence, conclusory claims of error will fail." (*S.C., supra,* 138 Cal.App.4th at p. 408.)

Plaintiffs' conclusory assertions that the litigation privilege does not apply to their "cause of action for intentional interference with contractual relations" or their "eight through twentieth causes of action"[15] does not constitute "adequate factual or legal analysis." (*Placer County Local Agency Formation Com. v. Nevada County Local*

---

15      Although plaintiffs' brief reference their "eight through twentieth causes of action," the second amended complaint only contains eighteen claims.

*Agency Formation Com.* (2006) 135 Cal.App.4th 793, 814.)  The record demonstrates that most of these claims were not dismissed pursuant to the litigation privilege.  The trial court dismissed the plaintiffs' thirteenth through sixteenth claims, which allege interference with contract relations and prospective economic advantage, based on the statute of limitations.  The tenth and eleventh claims for violation of the Fair Debt Practices Act and RICO were dismissed pursuant to an order sustaining a demurrer that is not in the record and was not appealed by plaintiffs.  The plaintiffs' twelfth and seventeenth claims for forcible detainer and an accounting were dismissed pursuant to an order granting defendants' motion for judgment on the pleadings.  Plaintiffs, however, provide no independent legal analysis of that motion or the resulting order.

Plaintiffs' discussion of the litigation privilege consists of little more than a summary of general abstract principles that is devoid of a single citation to the record.  (See generally *Metzenbaum v. Metzenbaum* (1950) 96 Cal.App.2d 197, 199 ["An appellate court cannot be expected to search through a voluminous record to discover evidence on a point raised by appellant when his brief makes no reference to the pages where the evidence on the point can be found in the record"].)  Although plaintiffs' brief summarizes various holdings pertaining to different aspects of the litigation privilege, it fails to adequately explain how those holdings relate to the non-foreclosure claims asserted in the complaint.

In sum, to the extent plaintiffs were requesting that we reverse the trial court's dismissal of any claims beyond those seeking to set aside the foreclosure sale, they failed "to provide meaningful legal analysis and record citations for [their] complaints." (*S.C., supra,* 138 Cal.App.4th at p. 408.)[16]  These claims have therefore been abandoned. (*Reyes, supra,* 65 Cal.App.4th at p. 466, fn. 6)

---

16      The final paragraph of plaintiffs' brief asserts that "Respondents were awarded attorneys' fees as prevailing parties" and requests that the "award of costs and attorney's fees . . . be vacated."  This portion of the brief does not contain any citation to legal authority or the record.  Moreover, the plaintiffs failed to include a copy of the order awarding fees and costs in the appellate record. Without such materials, we have no basis

31

## DISPOSITION

The trial court's judgment is reversed and the case is remanded for further proceedings.  The trial court's order granting defendants' motion for summary judgment, or, in the alternative, summary adjudication is reversed to the extent it dismisses plaintiffs' second, third, sixth and seventh claims.  The trial court's order granting defendants' motion for judgment on the pleadings is affirmed.  Each party shall its own costs.


ZELON, J.

We concur:


PERLUSS, P. J.


JACKSON, J.

---

to review the order.  (*Buckhart v. San Francisco Residential Rent Etc., Bd.* (1988) 197 Cal.App.3d 1032, 1036 ["The appellant must affirmatively demonstrate error by an adequate record"].)